**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| **S&M BRANDS, INC. and** ) | |
| **INTERNATIONAL TOBACCO PARTNERS,** ) | |
| **LTD.,** ) | |
| ) | |
|     **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Case No. 3:05-0171** |
| ) | |
| **PAUL G. SUMMERS, in his official capacity as** ) | **Judge Thomas A. Wiseman, Jr.** |
| **Attorney General of the State of Tennessee,** ) | |
| ) | |
|     **Defendant.** ) | |

**MEMORANDUM OPINION**

**I. INTRODUCTION**

Plaintiffs S&M Brands, Inc. ("S&M") and International Tobacco Partners, Ltd. ("ITP") (collectively, "Plaintiffs") filed their Complaint on January 19, 2005 in the Eastern District of Tennessee, Greeneville Division, seeking injunctive and declaratory relief. The case was transferred to the Middle District of Tennessee on February 28, 2005. Defendant Paul G. Summers, in his official capacity as Attorney General of the State of Tennessee ("Defendant"), filed his Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief may be granted and Memorandum of Law in support thereof (Doc. Nos. 35 and 36) on March 21, 2005. Plaintiffs filed their response in opposition to Defendant's motion on April 6, 2005 (Doc. No. 52). With the Court's permission, Defendant has filed a Reply (Doc. No. 82).

On April 15, 2005, the Court granted Plaintiffs' motion for a stay of adjudication of the motion to dismiss and stayed these proceedings entirely pending a decision by the Judicial Panel on Multidistrict Litigation (the "Panel") whether to transfer this action, pursuant to 28 U.S.C. § 1407, for coordinated pretrial proceedings with four other basically identical actions filed in the Southern District of New York, the Eastern District of Kentucky, and the Northern District of Oklahoma. The Panel issued its Order Denying Transfer on June 16, 2005. Accordingly, the stay of these proceedings has been lifted and the Court is now prepared to issue its ruling on Defendant's Motion.

For the reasons set forth below, the Court will GRANT Defendant's motion to dismiss counts I and III of the Complaint in their entirety, with prejudice, and will likewise GRANT the motion to dismiss Count II of the Complaint with prejudice *except* insofar as Count II relates to Plaintiffs' claims that Defendant's allegedly retroactive enforcement of the 2004 amendment to the so-called Allocable Share Release provision originally contained in Tenn. Code Ann. § 47-31-103(a)(2)(B)(ii) violates their constitutional rights. That issue was not addressed in Defendant's motion, though it is the subject of a Motion for Partial Summary Judgment recently filed by Plaintiffs (Doc. No. 85), which has not yet been fully briefed and is not ripe for consideration. The Court will address the retroactivity issue in the context of ruling on that motion. For now, Defendant's motion as to that issue is DENIED.

## II. PROCEDURAL BACKGROUND

Plaintiffs' claims arise in connection with the Master Settlement Agreement ("MSA") executed in November 1998 by and among forty-six states and six territories[1] on the one hand (the "Settling States") and, on the other, the four largest domestic cigarette manufacturers (Philip Morris USA, Inc., R.J. Reynolds Tobacco Company, Brown & Williamson Tobacco Company, and Lorillard Tobacco Company (collectively referenced herein as the "Original Participating Manufacturers" ("OPMs") or the "Majors")). Plaintiffs are tobacco manufacturers or importers who did not join in the MSA, and they challenge the validity of certain statutes enacted by the State of Tennessee pursuant to the terms of the MSA, including the Tennessee Tobacco Manufacturers' Escrow Fund Act of 1999, Tenn. Code Ann. § 47-31-101 *et seq.* ("Escrow Act"), as amended effective April 20, 2004 by 2004 Pub. Acts. ch. 535, § 1, to repeal the "Allocable Share Release Provision" contained in the original version of Tenn. Code Ann. § 47-31-103(a)(2)(B)(ii) ("ASR Amendment"), and the tax laws passed to aid in the enforcement of the Escrow Act, Tenn. Code Ann. § 67-4-2601 *et seq.* ("Contraband Statute") (collectively referenced herein as the "Tobacco Statutes").

More specifically, Plaintiffs purport to assert three separate causes of action relating to the

---

[1]Four states—Florida, Minnesota, Mississippi and Texas—entered into prior separate agreements with the tobacco companies and therefore are not signatories to the MSA. The six additional United States jurisdictions that did sign the MSA include the District of Columbia, Puerto Rico, Virgin Islands, American Samoa, Guam and the Northern Mariana Islands. See MSA § II(qq); PTI, Inc. v. Philip Morris, Inc., 100 F. Supp. 2d 1179, 1185 n.2 (C.D. Cal. 2000).

Tobacco Statutes. First, Plaintiffs claim that the enactment and enforcement of the Tobacco Statutes have the effect of implementing an illegal combination or "output cartel" created by the Settling States and the participating manufacturers in the MSA, and that said implementation constitutes a *per se* restraint of trade in violation of the Sherman Act, to Plaintiffs' injury.[2] On those grounds, Plaintiffs request a declaration that the Tobacco Statutes are illegal and void under the Sherman Act, 15 U.S.C. § 1, and that they are preempted by federal law.[3] Second, Plaintiffs contend that enactment and enforcement of the Tobacco Statutes, together with the retroactive application of the ASR Amendment "without any notice by the defendant that he was intending to exercise a purported right to make a retroactive application thereof" (Compl. ¶ 95), violates Plaintiffs' procedural and substantive due process rights in violation of the Fourteenth Amendment to the United States Constitution. Finally, Plaintiffs claim that the enforcement of the Tobacco Statutes violates Plaintiffs' rights under the Equal Protection Clause of the Fourteenth Amendment in that it constitutes discrimination against those cigarette manufacturers such as Plaintiffs who are not party to the MSA but who seek to do business in Tennessee. As part of their third claim for relief, Plaintiffs also allege that enforcement of the Tobacco Statutes "burdens [their] First Amendment rights of freedom of speech and freedom to petition." (Compl. ¶ 98.) In addition, based upon the language contained in Plaintiffs' "Prayer for Relief," it appears that Plaintiffs may also seek a declaration that the MSA itself, or the "output cartel formed under the MSA, which includes Tennessee," violates the Sherman Act and the Clayton Act. Although it is not entirely clear whether Plaintiffs have in fact stated a legitimate claim for injunctive relief as to the MSA, the Court will nonetheless address that issue below.

In response to Plaintiffs' Complaint, the Defendant filed his Rule 12(b)(6) Motion to Dismiss for failure to state a claim upon which relief may be granted. In addition to arguing that Plaintiffs are not entitled to relief under any theory, Defendant also asserts that because ITP is a cigarette importer rather than a manufacturer, it is not directly affected by the MSA or the Tobacco Statutes and therefore lacks

---

[2]Plaintiffs also purport to state a class action but have not yet sought class certification.

[3]Plaintiffs mention the Clayton Act, 15 U.S.C. § 16, only in their "Prayer for Relief," but the Court presumes that Plaintiffs as private individuals intended to bring a cause of action for damages as authorized by the Clayton Act.

standing to bring any of the claims asserted in the Complaint. Defendant also asserts that he is not a proper defendant to this action by virtue of the Eleventh Amendment.

As mentioned in Part I, above, Defendant's motion and initial memorandum in support thereof do not address Plaintiffs' allegations regarding the retroactive application of the ASR Amendment, though Defendant does raise the issue in his Reply To Plaintiffs' Response To Motion To Dismiss (Doc. No. 82). Because the issue was not raised until the reply brief, the Court will not consider it here. See Wright v. Holbrook, 794 F.2d 1152, 1156 (6th Cir. 1986) ("It is impermissible to mention an issue for the first time in a reply brief, because the appellee then has no opportunity to respond.") (quoting Knighten v. Comm'r, 702 F.2d 59, 60 n.1 (5th Cir.), cert. denied, 464 U.S. 897 (1983)).

## III. STANDARD OF REVIEW

Under Rule 12 of the Federal Rules of Civil Procedure, a defendant may move to dismiss the plaintiff's complaint "for failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When considering a Rule 12(b)(6) motion to dismiss, a court must treat all of the well pleaded allegations of the complaint as true, Saylor v. Parker Seal Co., 975 F.2d 252, 254 (6th Cir. 1992), and must construe all of the allegations in the light most favorable to the plaintiff. Scheuer v. Rhodes, 416 U.S. 232, 236 (1974). The Court is not required, however, to "accept as true legal conclusions or unwarranted factual inferences." Bovee v. Coopers & Lybrand, C.P.A., 272 F.3d 356, 361 (6th Cir. 2001) (internal quotation marks and citation omitted).

A 12(b)(6) motion to dismiss is directed solely to the complaint, Roth Steel Prods. v. Sharon Steel Corp., 705 F.2d 134, 155 (6th Cir. 1983), and any exhibits attached to it, see Fed. R. Civ. P. 10(c) ("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes."). The merits of the claims set forth in the complaint are not at issue on a motion to dismiss for failure to state a claim. Consequently, a complaint will be dismissed pursuant to Rule 12(b)(6) only if there is no law to support the claims made, if the facts alleged are insufficient to state a claim, or if on the face of the complaint there is an insurmountable bar to relief. See Rauch v. Day & Night Mfg. Corp., 576 F.2d 857, 858 (6th Cir. 1976). Rule 12(b)(6) must be read in conjunction with Rule 8(a), which provides that a pleading for relief shall contain "a short and plain statement of the claim showing that the pleader is

4

entitled to relief." Fed. R. Civ. P. 8(a); 5A Wright & Miller, Federal Practice and Procedure, § 1356 (1990). The moving party is entitled to relief only when the complaint fails to meet this liberal standard.

## IV. FACTUAL BACKGROUND

In accordance with the standard of review referenced above, the Court will assume for purposes of reviewing Defendant's motion that the well pleaded facts as alleged by Plaintiffs are true. The Court will also take into consideration the actual text of the MSA, which is incorporated by reference into the Complaint; however, the Court does not base its ruling on this motion upon any statements in the text of the MSA that are at odds with Plaintiffs' allegations.[4]

According to the recitals set forth in the MSA, by 1998 more than forty states had commenced litigation against the tobacco companies, alleging a wide range of deceptive and fraudulent practices by the tobacco companies over decades of sales, and seeking equitable and injunctive relief as well as monetary relief to cover the burgeoning costs of tobacco-related healthcare. Those states that had not yet filed suit against the tobacco companies had the potential to do so. See MSA § I, at 1. The MSA documents a global settlement of all of those lawsuits among the Settling States, including those that had already filed suit as well as those that had indicated an intention to do so, and the participating tobacco product manufacturers, including the OPMs as well as other tobacco product manufacturers who chose to enter into the agreement subsequent to its original execution. See MSA § II(tt). In fact, approximately forty-five other tobacco manufacturers—"Subsequent Participating Manufacturers" (or "SPMs") (collectively with the OPMs, Participating Manufacturers or "PMs")—joined in the settlement sometime after its execution by the OPMs.[5]

Pursuant to the MSA, the signatory states agreed to dismiss their pending lawsuits against the PMs in exchange for yearly payments, see MSA § IX, which the states would use to defray healthcare costs arising from smoking-related illnesses and to fund smoking-prevention programs, id § VI. In addition to making payments, the PMs also agreed to significant restrictions on their advertising and promotional activities. See generally MSA § III.

---

[4]The MSA may be accessed on-line at <www.naag.org/upload/1032468605_cigmsa.pdf>.

[5]See <http://www.naag.org/upload/1124980695_PM_list_as_of_August_25_05.pdf>.

All payments made pursuant to the MSA are deposited into an escrow account and disbursed annually among the Settling States. Generally speaking, each state receives its "Allocable Share" under the MSA, which is based upon the percentage agreed to by and among the states. See MSA § II(f) (defining "Allocable Share") and § II(g) (defining "Allocable Payment"). Tennessee's Allocable Share is 2.4408945%. MSA, Ex. A. In other words, Tennessee receives approximately 2.44% of the payments made by all the PMs into the escrow account annually, regardless of whether all or none of any PM's cigarettes are sold in Tennessee.[6]

For their part, the SPMs, like the OPMs, are bound by the MSA's public health provisions and may be required to make settlement payments to the Settling States depending upon their sales volumes. The MSA provides that an SPM only incurs a payment obligation to the extent its Market Share (as defined by the MSA) in any calendar year exceeds the greater of its 1998 Market Share or 125% of its 1997 Market Share. MSA § IX(i)(1). That provision, however, only benefits SPMs who joined the MSA within sixty days of its original execution date in November 1998, since the MSA further stipulates that the 1997 or 1998 Market Share for any SPM who joins the MSA outside that sixty-day window is considered to equal zero for purposes of § IX(i)(1). See MSA § IX(i)(4).

The MSA also contemplates the passage of "Qualifying Statutes" (or "Escrow Statutes") by each Settling State for the stated purpose of "effectively and fully neutraliz[ing] the cost disadvantages that the Participating Manufacturers experience vis-à-vis Non-Participating Manufacturers ["NPMs"] within such Settling State as a result of the provisions of this Agreement." MSA § IX(d)(2)(E). More particularly, the MSA provides that any state that enacted legislation patterned after the "Model Statute" attached as Exhibit T to the MSA, without material modification or addition, would be exempt from the "NPM Adjustment" that would otherwise be permitted pursuant to MSA § IX(d)(1), to account for market share lost by the PMs to the NPMs as a result of the former group's participation in the MSA.

Encouraged by that financial incentive, all of the Settling States have enacted an escrow statute based upon the Model Statute. Most Settling States, including Tennessee, have also enacted

---

[6]This is somewhat of a simplification, as the payments made are subject to various offsets and adjustments. See MSA §§ II(f) and (g), and IX (*passim*).

"complementary legislation," to which Plaintiffs refer as the "Contraband Statutes" for the purpose of assisting the states in enforcing the escrow statutes. See Tenn. Code Ann. § 67-4-2601 et seq. The Contraband Statute as enacted in Tennessee does not impose any substantive obligations upon Plaintiffs or any other tobacco product manufacturers. Instead, it simply requires all tobacco product manufacturers to certify their compliance with the MSA or the Escrow Act before being included on a directory of tobacco product manufacturers authorized to sell cigarettes in Tennessee. Id. § 67-4-2602. The Contraband Statute also prohibits anyone from selling, possessing or affixing tax stamps to cigarettes sold by any manufacturer or importer not included on the directory. Id. § 67-4-2602(c).

According to the terms of the Model Statute, NPMs had the ability to use a cost advantage enjoyed as a result of their decision not to join in the MSA to "derive large, short-term profits in the years before liability may arise without ensuring that the State will have an eventual source of recovery from them if they are proven to have acted culpably." MSA, Ex. T. In order to "[p]rotect the public health gains achieved by [the MSA]," MSA § IX(d)(1), and to prevent the NPMs from deriving the anticipated windfall profits resulting from their NPM status and then becoming judgment-proof before liability might arise, the Model Statute requires each NPM either to become a participating manufacturer as defined by the MSA or to deposit into a qualified escrow fund, on an annual basis, a certain amount of money per cigarette sold each year in each state in which it sells cigarettes and in which the Model Statute has been enacted. The Model Statute provides for interest on the escrow payments, and further allows for the release of the funds in escrow after twenty-five years unless they are released before that to pay a judgment or settlement of any claim brought against the NPM by the state or any individual within the state. Most importantly for purposes of the present motion, however, the Model Statute as originally drafted—and the Tennessee Escrow Act that was modeled after it—provide that, if "the amount [any NPM] was required to place into escrow in a particular year was greater than the State's allocable share of the total payments that such manufacturer would have been required to make in that year under the [MSA] . . . the excess shall be released from escrow and revert back to such [NPM]." MSA, Ex. T. Plaintiffs refer to this provision as the "Allocable Share Release" provision (or "ASR provision").

According to the Defendant, the ASR provision was "intended to create a rough equivalence

7

between an NPM's escrow obligation under the [Escrow Act] and its hypothetical payment obligation under the MSA had it been a PM." (Def.'s Mem. (Doc. No. 36) at 6.) Such equivalence allegedly was not achieved because, under the Escrow Act as originally drafted, some NPMs "have taken advantage of this provision as a loophole to frustrate the fundamental purposes of the [Escrow] Act [by obtaining] releases of virtually all their escrow funds, leaving Tennessee with no effective security for future claims and creating widely varying escrow obligations among the NPMs." (Doc. No. 36, at 6.) For example,

> an NPM that made all of its 2003 sales—say, 2 million packs of cigarettes—in Tennessee . . . would [under the original Escrow Act] have had to make an initial escrow deposition . . . of approximately forty (40) cents per pack, for a total deposit of $800,000. As the allocable share provision operated . . . , the NPM could. . . receive[] a release of [all but 2.44 %—Tennessee's allocable share—of that amount].

(Doc. No. 36, at 7.) NPMs that distributed their products nationwide rather than regionally were not similarly advantaged by this provision, since they would also be making escrow payments in all states which they sold cigarettes.[7]

In response to this perceived flaw in the statutory scheme, Tennessee, along with most of the other Settling States,[8] enacted an amendment to the Escrow Act that effectively repealed the ASR provision, much to the chagrin of Plaintiffs and other regional NPMs that benefitted from the statute as originally drafted. As amended, the ASR provision no longer allows a refund of all amounts in excess of the state's allocable share percentage. Instead, it simply permits a refund of any amount paid into escrow that the tobacco product manufacturer establishes was in excess of the amount it would have had to pay under the MSA. See 2004 Pub. Acts. ch. 535, § 1 (the "ASR Amendment"), codified at Tenn. Code Ann. § 47-31-103(a)(2)(B)(ii) (2005).

Notwithstanding Defendant's explanation and the various recitations contained within the text

_____

[7]More specifically, the ASR provision in Tennessee's Escrow Act originally read as follows: To the extent that a tobacco product manufacturer establishes that the amount it was required to place into escrow *in a particular year was greater than the state's allocable share of the total payments that such manufacturer would have been required to make in that year under the master settlement agreement* (as determined pursuant to § IX(i)(2) of the master settlement agreement . . . ) had it been a participating manufacturer, the excess shall be released from escrow and revert back to such tobacco product manufacturer . . . .
Tenn. Code Ann. § 47-31-103(a)(2)(B)(ii) (2003) (repealed) (emphasis added).

[8]As of April 2005, 42 states had repealed the ASR provision. See http://www.naag.org.

of the MSA, Plaintiffs maintain that the true purpose of the MSA itself was to set up a "cartel . . . to control the output of cigarettes made by the companies in the cartel . . . and penalize [the NPMs], thereby creating supracompetitive prices and splitting the proceeds of that output cartel between them and the Settling States." (Compl. at 1–2.) Also according to Plaintiffs, the purpose of the Escrow Statutes enacted by the Settling States was "to preclude entrance into the cigarette market and price competition in that market by NPMs . . . . Because of the MSA and these statutes, NPMs must pay penalties into an escrow fund equivalent to what they would have paid if they were [SPMs] . . . . These penalties are more severe than the annual contributions made by [PMs]." (Compl. at 2.)

Plaintiffs further claim that the ASR as originally drafted was

a crucial element in the decision making process of the small manufacturers who had the opportunity to join the MSA from the period following its execution in late November 1998 through March of 1999 . . . .

The presence of the ASR . . . presented the small regional NPMs with an opportunity to exist competitively, . . . because those escrow payments would not approach the full MSA payment until a regional SPM became national in scope. In reaching the decision not to become an SPM and to remain a regional NPM in the meetings held during the first part of 1999 in New York with the attorneys for the Settling States as well as the attorneys for the Majors, the NPMs were assured that the release provisions of the Escrow Statute would not be changed and, indeed, the MSA prohibits such changes unless <u>all</u> of the parties to the MSA, <u>i.e.</u>, all of the Settling States and all of the Participating Manufacturers agreed to such changes . . . . Finally, the MSA stated that the original Escrow Statute, with the release for overpayments, "fully and effectively" neutralized the cost disadvantages that the MSA signatories suffered from the NPMs.

(Compl. ¶¶ 28, 30.) In other words, it is clear that Plaintiffs—as regional rather than national NPMs—were not actually penalized by the ASR provision as originally drafted. In fact, where Defendant maintains that the "loophole" in the original ASR had unintended consequences, Plaintiffs contend that the intent of the original ASR provision was "[t]o lessen the serious antitrust and constitutional problems inherent in a nationwide cartel created by the States and the Majors that penalizes the NPMs" (Compl. at 2), by imposing a lighter burden upon the regional NPMs than upon national NPMs or PMs, thereby permitting them to compete with the PMs. Now, however, "at the behest of the [Majors], states are now changing the escrow rules to force [regional] NPMs to pay escrow as if they were operating in the entire United States." (Compl. at 2–3.)

Thus, according to Plaintiffs, the OPMs changed their minds about permitting regional NPMs

to compete, and the real purpose of the ASR Amendment is "to effectively wipe out NPM competition" (Compl. ¶ 39) and "to preserve the supracompetitive revenues realized by the Majors at the expense of victimizing the consumers through enforcing the output cartel [created by the MSA]" (Compl. ¶ 44). Further, Plaintiffs allege that the "amount of MSA annual settlement payments depends upon the amount of continuing sales of cigarettes by the Majors," and that the Defendant therefore "has a vested interest in assuring that the Majors sell enough cigarettes" to sustain their market shares and thus maintain the level of payments coming to Tennessee under the MSA.  (See Compl. ¶ 45.)

Clearly, while Plaintiffs allege that the ASR provision, as originally enacted, and the Contraband Statute both serve to implement and enforce the illegal output cartel that was put into place through the execution of the MSA, the primary focus of their arguments is on the ASR Amendment.  In a nutshell, Plaintiffs allege that there is no public health benefit served by the ASR Amendment, and that the repeal was enacted solely at the urging of the Majors and for the purpose of preserving the Majors' market dominance, thereby protecting the payments made by them to the state of Tennessee under the MSA.

Plaintiffs' other issue regarding the ASR Amendment is that the Defendant allegedly adopted the position, after its effective date, that the ASR Amendment would be applied retroactively, despite the fact that the statute itself does not state that it would be applied retroactively and the legislative history does not reveal an intent to apply it retroactively.  Plaintiffs claim to be significantly harmed by this allegedly illegal and unconstitutional retroactive application of the amendment.  (See Compl. ¶¶ 49, 50, 95.)

Having set forth these background facts, the Court will now consider the Defendant's arguments in support of its motion to dismiss.

**V.  LEGAL ANALYSIS**

    **A.  Whether ITP Has Standing to Bring Claims In the Complaint**

Defendant argues that because Plaintiff ITP is a cigarette importer and not a cigarette manufacturer, it does not have standing to challenge the enactment or enforcement of the Tobacco Statutes.  See Tenn. Code Ann. § 47-31-102(9)(A) (defining the terms "tobacco product manufacturer") and § 47-31-103 (by its terms, applying only to "any tobacco product manufacturer").  Plaintiffs respond

that (1) Defendant misconstrues the requirements for standing, particularly under the liberal standing provisions of the Clayton Act, 15 U.S.C. § 26; and (2) the "NAAG [National Association of Attorneys General] routinely accepts importers of cigarettes as *de jure* SPMs as well as NPMs" (Pls.' Resp. Opp. to M. Dism. (Doc. No. 51) at 21–22). The Court finds that Plaintiffs' arguments in support of ITP's standing largely miss the point, but nonetheless holds that the allegations in the Complaint are sufficient to establish that ITP has standing.

### (1) The Doctrine of Standing

The doctrine of standing is directed at ensuring that any plaintiff before the court "is a proper party to request an adjudication of a particular issue." Flast v. Cohen, 392 U.S. 83, 100 (1968). "[A]t an irreducible minimum, [Article III of the Constitution] requires the party who invokes the court's authority to 'show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant.' " Valley Forge Christian Coll. v. Americans United for the Separation of Church and State, Inc., 454 U.S. 464, 472 (1982) (quoting Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 99 (1979)). Moreover, the injury must be fairly traceable to the challenged action and must be likely to be redressed by a favorable decision. Id. at 472 (citation omitted). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.' " Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992) (quoting Lujan v. National Wildlife Federation, 497 U.S. 871, 889 (1990)).

In the context of a challenge to a state statute on the grounds of preemption or unconstitutionality, the party seeking relief for past or reasonably likely prospective injury must demonstrate some causal connection between the past or prospective injury and the challenged statute in order to establish standing. NUI Corp. v. Kimmelman, 765 F.2d 399, 404 (3d Cir. 1985) (citations omitted); see also Brown v. Ferro Corp., 763 F.2d 798, 801 (6th Cir. 1985) ("Abstract injury is not enough. It must be alleged that the plaintiff 'has sustained or is immediately in danger of sustaining some direct injury' as the result of the challenged statute or official conduct.") (quoting O'Shea v. Littleton, 414 U.S. 488, 494 (1974); internal citations omitted).

In light of these principles, Defendant does not contest the premise that a party directly affected by a statute has standing to challenge it as a person who has sustained or is "in danger of sustaining some direct injury as a result" of the enforcement of that statute. Ferro Corp., 763 F.2d at 801. Rather, Defendant argues that ITP lacks standing because it is not a "tobacco product manufacturer" as that term is defined by the Tobacco Statutes and therefore is not subject to or affected by these Statutes. Evidently, Defendant would have to concede that if the Complaint sufficiently alleges that ITP does fall within the statutory definition of "tobacco product manufacturer," then the Court must conclude, at this point in the proceedings, that ITP is directly affected by—and has standing to challenge—the subject legislation. See id.

### (2) Whether ITP Is a "Tobacco Product Manufacturer" As Defined By the Escrow Act

The Escrow Act defines a "tobacco product manufacturer" as an entity that (1) "directly . . . [m]anufactures cigarettes anywhere that such manufacturer intends to be sold in the United States," or (2) "[i]s the first purchaser anywhere for resale in the United States of cigarettes manufactured anywhere that the manufacturer does not intend to be sold in the United States." Tenn. Code Ann. § 47-31-102(9)(A)(i) and (ii).[9] The Contraband Statute expressly adopts this same definition, see Tenn. Code Ann. § 67-4-2601(9). In other words, under certain circumstances, the Tobacco Statutes by their terms may include purchasers or importers within the definition of "tobacco product manufacturer."

Plaintiffs do not contest Defendant's characterization of ITP an importer. However, neither Plaintiffs' Complaint nor any of their filings in opposition to Defendant's Motion to Dismiss contains any specific factual allegations regarding whether ITP is "the first purchaser anywhere" for the cigarettes it imports and sells. There is likewise no information in the pleadings to indicate from whom ITP purchases cigarettes and whether those manufacturers intend their tobacco products to be sold in the United States. Notwithstanding, in their Complaint, Plaintiffs do allege that they are "manufacturers or importers that do not participate in the MSA output cartel, i.e., NPMs, as defined by the MSA." (Compl.

---

[9]A successor of an entity described in Tenn. Code Ann. § 47-31-102(9)(A)(i) or (ii) also is defined as a tobacco product manufacturer. Tenn. Code Ann. § 47-31-102(9)(A)(iii).

12

at 3.)[10]  Plaintiffs further allege that they "resell" cigarettes in Tennessee "to direct-buying wholesalers ('DPWs')[, who] are wholesalers licensed to place state excise tax stamps on cigarettes" in Tennessee, without which stamps the cigarettes are not legally saleable in Tennessee.  (Compl. at 3.)  Further, Plaintiffs allege that, as NPMs, they are directly affected by the "penalties" imposed by the Escrow Act and ASR Amendment (Compl. at 2), which they claim were "intended to and are putting the NPMs out of business" (Compl. ¶ 9).

In other words, Plaintiffs allege that ITP is directly affected by enforcement of the statutes at issue.  For purposes of withstanding Defendant's Motion to Dismiss, these allegations are sufficient to establish that ITP has standing to challenge enforcement of those statutes.  Cf. Lujan, 504 U.S. at 561. Defendant's motion to dismiss the claims brought against him by ITP on the basis that ITP lacks standing will therefore be denied.

### B.  Eleventh Amendment Considerations

#### (1)  Whether Attorney General Summers Is a Proper Defendant In This Action

Defendant argues that Plaintiffs' claims are subject to dismissal because he is entitled to immunity under the Eleventh Amendment and that the exception stated in Ex Parte Young, 209 U.S. 123 (1908), does not apply.  Although the Plaintiffs have not responded to this argument, the Court concludes that Defendant, the Attorney General of the State of Tennessee, is not entitled to Eleventh Amendment immunity to the extent Plaintiffs are seeking purely prospective injunctive and declaratory relief.

The Eleventh Amendment provides:

> The Judicial Power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI.  Although the amendment does not expressly address the federal courts' jurisdiction over suits against a state by one of its own citizens, it has been interpreted to preclude such suits as well.  See Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 100 (1984); Hans v.

---

[10]The MSA's definitions of "tobacco product manufacturer" and "non-participating manufacturer" are identical to those contained in the Tennessee statutes.  See MSA §II(cc) and (uu).

<u>Louisiana</u>, 134 U.S. 1 (1890). One exception to this general rule allows suits seeking prospective injunctive and declaratory relief when state officials are named as nominal defendants.[11] <u>See</u> <u>Nevada v. Hall</u>, 440 U.S. 410, 420 n. 19 (1979); <u>Ex Parte Young</u>, 209 U.S. at 159–60 (1908).

However, the suit will be barred by the Eleventh Amendment, even if a state official rather than the state itself is the named party to the action, if the action is "in essence one for the recovery of money from the state" and "the state is the real, substantial party in interest." <u>Edelman v. Jordan</u>, 415 U.S. 651, 663 (1974) (quoting <u>Ford Motor Co. v. Indiana Dep't of Treasury</u>, 323 U.S. 459, 464 (1945)). "[T]he rule has evolved that a suit by private parties seeking to impose a liability which must be paid from public funds in the state treasury is barred by the Eleventh Amendment." <u>Edelman</u>, 415 U.S. at 663 (citations omitted); <u>see also</u> <u>Barton v. Summers</u>, 293 F.3d 944, 948–49 (6th Cir. 2002) (holding that § 1983 actions brought against the Attorneys General of Tennessee and Kentucky by Medicaid recipients with tobacco-related illnesses were barred by the Eleventh Amendment where the suits sought injunctions forcing the states to turn over portions of tobacco settlement proceeds). As a result, even though the formal requirements of <u>Ex Parte Young</u> may be met by naming a state official rather than the state itself as the defendant, and seeking injunctive relief only, relief should not be granted if "the relief is tantamount to an award of damages for a past violation of federal law, even though styled as something else." <u>Papasan v. Allain</u>, 478 U.S. 265, 278 (1986).

Under an exception to the exception, however, if the injunctive relief sought by the plaintiff is truly prospective non-monetary relief, sovereign immunity will not bar the suit simply because the state may be required to make incidental expenditures in complying with the injunction. <u>Milliken v. Bradley</u>, 433 U.S. 267, 289 (1977) (federal courts are permitted to enjoin state officials to conform their conduct to requirements of federal law via injunction, notwithstanding a direct and substantial impact on the state treasury); <u>Edelman</u>, 415 U.S. at 667–68 (suit was proper only where the "fiscal consequences to state treasuries . . . were the necessary result of compliance with decrees which by their terms were

---

[11]Two other exceptions have been recognized, neither of which appears to apply in this instance: (1) States may consent to suit, <u>see</u> <u>Alden v. Maine</u>, 527 U.S. 706 (1999); and (2) Congress may abrogate the state's immunity pursuant to its powers under the Fourteenth Amendment, <u>see</u> <u>Seminole Tribe v. Florida</u>, 517 U.S. 44, 72–73 (1996).

prospective in nature").   The dividing line, therefore, is whether the money or the non-monetary injunction is the primary thrust of the suit.

Plaintiffs in this case have couched their claims entirely in prospective language, seeking declaratory and injunctive relief:  They seek judicial declarations that the MSA and Tennessee Tobacco Statutes, including the repeal of the original ASR provision, are preempted by federal antitrust law and that they violate Plaintiffs' rights under the First and Fourteenth Amendments.   They seek injunctive relief "temporarily, preliminarily and permanently restraining and enjoining the defendant and his agents and all those acting in concert with Tennessee from administering and enforcing the [Tobacco Statutes]."   (Compl., Prayer for Relief, at 39.)   This type of relief falls squarely within the ambit of Ex Parte Young, since the state Attorney General is named as a defendant and Plaintiffs request an injunction prohibiting him from enforcing or continuing to enforce state statutes that are allegedly unconstitutional or preempted by federal law.   These claims are therefore not barred by the Eleventh Amendment.   Cf. Barton, 293 F.3d at 948 ("[T]he Eleventh Amendment does not bar a federal court from issuing an injunction ordering prospective relief against a state official in order to prevent future constitutional violations."); PTI, Inc. v. Philip Morris Inc., 100 F. Supp. 2d 1179, 1191 (C.D. Cal. 2000) (rejecting Eleventh Amendment immunity argument on the basis of Ex Parte Young where plaintiffs, cigarette importers, brought suit against state officials who signed the MSA alleging that the MSA and implementing state legislation violated federal antitrust laws and the Constitution).

### (2)  Whether the "Alternative Relief" Plaintiffs Seek Is Barred By the Eleventh Amendment

More problematically, Plaintiffs here also include in their Prayer for Relief a request for an injunction "in the alternative" prohibiting Defendant "from enforcing a retroactive application of the repeal of the ASR."   (Compl., Prayer for Relief, at 39.)   In case their point is not entirely clear, Plaintiffs, in their recently filed Motion for Partial Summary Judgment, request that the Court "enjoin retroactive application of the ASR repealer *and order the Attorney General to release plaintiffs' funds*."   (Doc. No. 86, at 9 (emphasis added).)   As indicated above, the Eleventh Amendment completely bars suits against sovereign states (or state officials named in their official capacities) seeking retrospective monetary relief.

15

In <u>Edelman</u>, for example, the plaintiff brought suit against various Illinois state officials on the grounds that they were administering the federal-state programs of Aid to the Aged, Blind, or Disabled (AABD) in a manner inconsistent with various federal regulations and with the Fourteenth Amendment to the Constitution. The plaintiff requested declaratory and injunctive relief, and specifically requested "a permanent injunction enjoining the defendants to award to the entire class of plaintiffs all AABD benefits wrongfully withheld." <u>Edelman</u>, 415 U.S. at 656. The district court entered judgment for the plaintiffs, granting a permanent injunction requiring compliance with federal law and ordering the state officials retroactively to release and remit AABD benefits that had been wrongfully withheld. <u>See</u> <u>id.</u> The Seventh Circuit affirmed. On appeal, the Supreme Court reversed that portion of the Court of Appeals' decision which affirmed the district court's order that retroactive benefits be paid by the Illinois state officials. <u>Id.</u> at 659.

In reaching its decision, the Court rejected the appellate court's reasoning that the Eleventh Amendment and <u>Ex Parte Young</u> did not bar the award of retroactive payments of the wrongfully withheld statutory benefits because the grant of such a monetary award was "in the nature of equitable restitution." <u>See id.</u> at 664. Regardless of the equitable nature of the remedy, the Court found that the payments would obviously not come from the personal resources of the state officials named as defendants, but would, "rather, involve substantial expenditures from the public funds of the state." <u>Id.</u> at 665 (quoting <u>Rothstein v. Wyman</u>, 467 F.2d 226, 236–37 (2d Cir. 1972), <u>cert. denied</u>, 411 U.S. 921 (1973)). Since the "funds to satisfy the award in this case must inevitably come from the general revenues of the State of Illinois," the Court found the award in that case "resemble[d] far more closely the monetary award against the State itself, <u>Ford Motor Co. v. Department of Treasury</u>, <u>supra</u>, than it [did] the prospective injunctive relief awarded in <u>Ex parte Young</u>," and therefore clearly ran afoul of the Eleventh Amendment. <u>Edelman</u>, 415 U.S. at 665.

Likewise, in the earlier <u>Ford Motor Co.</u> case, a taxpayer who had paid certain taxes to the State of Indiana, under protest, sought a refund of those taxes from the Indiana state officials who were charged with their collection. The taxpayer claimed that imposition of the tax violated the United States Constitution. <u>Ford Motor Co.</u>, 323 U.S. 460–61. As the Court subsequently noted in <u>Edelman</u>, "[t]he

16

term 'equitable restitution' would seem even more applicable to the relief sought in [Ford Motor Co.], since the taxpayer had at one time had the money, and paid it over to the State pursuant to an allegedly unconstitutional tax exaction." Edelman, 415 U.S. at 669. Notwithstanding, the Court held in Ford Motor Co. that the taxpayer's action suit against the State was barred by the Eleventh Amendment, just as the claim for retroactive benefits was barred in Edelman.

Thus, on the basis of Ford Motor Co., Edelman and the cases cited therein, it is clear that a monetary award to be paid from "public funds in the state treasury," Edelman, 415 U.S. at 663, for whatever reason, is precluded by the Eleventh Amendment. The issue in the case at bar is whether it makes a difference, for Eleventh Amendment purposes, that the funds Plaintiffs allege have been wrongfully withheld are not held in the State treasury, but are on deposit in an escrow account to which Plaintiffs have equitable ownership. Ford Motor Co., Edelman and their progeny all apply to requests for monetary damages, however denominated, to be paid from *public funds*. In the case at bar, the issue involves the disposition of funds that are not held in the public treasury at all and to which Tennessee has no present ownership interest. The Escrow Act provides for interest to be paid to Plaintiffs on any funds held in their escrow accounts, and further provides for the reversion of the funds to Plaintiffs at a future date to the extent the amount deposited in escrow exceeds the amount they are required by law to keep on deposit. Tenn. Code Ann. §47-31-103(a)(2)(B).

Moreover, the relief requested is an injunction effectively prohibiting Defendant from continuing to hold, in the future, funds that belong to Plaintiffs and which the law allows them eventually to recover. In other words, the issue, according to Plaintiffs, is not whether the state may be required to pay monetary damages from the state treasury for wrongfully refusing to release funds in the past, but whether the state may be permitted to continue to prevent the release of the same funds in the future, despite alleged constitutional violations in doing so. Prospective injunctive relief in the form of a declaration that retroactive application of the ASR Amendment violates Plaintiffs' constitutional rights, and an injunction prohibiting the state from continued adherence to that position, would have the ancillary effect of requiring the release of funds from Plaintiffs' escrow account.

The Court therefore concludes that an award of this type would not constitute an impermissible

award of retroactive monetary relief from state funds. It would not affect the sovereignty of the state, nor would it result in a reallocation of funds to the detriment of the public trust or anything of that nature. The Eleventh Amendment therefore does not bar this form of relief.[12] Accordingly, the Court will proceed with analysis of the substantive aspects of Defendant's motion.

### C. Whether the MSA and the Tobacco Statutes Violate the Sherman Act

As indicated above, Plaintiffs claim in their Complaint, first, that the MSA itself is in violation of federal antitrust laws because it serves to implement an output cartel that is illegal *per se*, and that the enforcement of the Tennessee Tobacco Statutes likewise serves to implement an illegal restraint in violation of the Sherman Act. Plaintiffs therefore seek a declaration that the Tobacco Statutes are preempted by federal antitrust law, and they appear to seek a declaration that the MSA is preempted as well.

In his Motion to Dismiss, Defendant argues that actions taken by the Tennessee Legislature, including the passage of the Escrow Act, the amendment thereto, and the Contraband Statute, are "state actions" that are immune from challenges on antitrust grounds. (Doc. No. 36, at 13 (citing Hoover v. Ronwin, 466 U.S. 558, 567–68 (1984) ("[W]hen a state legislature adopts legislation, its actions constitute those of the State, and *ipso facto* are exempt from the operation of the antitrust laws."); Sanders v. Lockyer, 365 F. Supp. 2d 1093 (N.D. Cal. Mar. 28, 2005) (dismissing antitrust challenges to the MSA and California's implementing legislation brought by a tobacco products consumer against California's attorney general and the four major tobacco companies, on grounds of state-action immunity); PTI, Inc. v. Philip Morris, Inc., 100 F. Supp. 2d 1179, 1196 (C.D. Cal. 2000) (holding that California's statutory scheme to implement the MSA was direct legislative activity and therefore immunized as state action)).)

Plaintiffs, in response, refer the court to a memorandum filed in support of a prior motion in this case (Doc. No. 49), in which they argue that a "state statute that creates an anticompetitive restraint

---

[12]It bears emphasis that this is not a case in which the plaintiffs seek an injunction from a federal court simply requiring state officials to comply with state law. That form of relief clearly would be barred by the Eleventh Amendment. Pennhurst, 465 U.S. at 101–02; O'Hara v. Wigginton, 24 F.3d 823, 826 (6th Cir. 1994)

empowering private actors to raise prices is defined as a hybrid restraint" (Doc. No. 49, at 8), and that the Escrow Act, as a so-called "hybrid" restraint, is not automatically subject to state-action immunity. More specifically, Plaintiffs argue that "Supreme Court authority unequivocally holds that to qualify for state action immunity, [hybrid] restraints . . . require active State supervision of the pricing activity of the private actors."  (Doc. No. 49 at 8 (citing Freedom Holdings, Inc. v. Spitzer, 357 F.3d 205, 223–24 (2d Cir.), reh'g denied, 363 F.3d 149, 154 (2004); Mariana v. Fisher, 338 F.3d 189, 201–02 (3d Cir. 2003), cert. denied sub nom Mariana v. Pappert, 540 U.S. 1179 (2004); A.D. Bedell Wholesale Co. v. Philip Morris, Inc., 263 F.3d 239, 255 (3d Cir. 2001), cert. denied, 534 U.S. 1081 (2002)).)

As discussed below, this Court concludes that the MSA (to the extent Plaintiffs intend to challenge it directly) and the Tennessee Tobacco Statutes are immune from challenge on antitrust grounds under the state-action doctrine, and that the Defendant, in his official capacity, is immune from liability for enforcing or threatening to enforce them on antitrust grounds.  The Court expressly rejects the reasoning applied by the Second Circuit in Freedom Holdings, as well as the Third Circuit's holdings regarding the applicability of state-action immunity in Mariana v. Fisher and A.D. Bedell to the extent the latter case may be construed as inconsistent with the holding herein.  The Court begins its analysis with a review of these earlier decisions addressing this issue.

### (1) *A.D. Bedell and Its Progeny*

In A.D. Bedell, wholesalers of tobacco products brought suit against the four major cigarette manufacturers, alleging Sherman Act violations arising from the execution and implementation of the MSA itself.  Importantly, plaintiffs in that case did not challenge the implementing statutes nor name any state official as a defendant in any capacity.  Instead, they alleged that the MSA primarily furthered the interests of private tobacco companies and not those of the States, and empowered the tobacco companies to make anticompetitive decisions with no regulatory oversight by the States.  Id. at 260.

The district court granted defendants' motions to dismiss plaintiffs' antitrust claims on the alternative grounds that the acts in question—the negotiation and execution of the MSA—were exempt from liability under the Parker doctrine of state-action immunity, see Parker v. Brown, 317 U.S. 341 (1943), and the Noerr-Pennington doctrine, which provides basically absolute antitrust immunity to any

19

party who petitions the government for redress, regardless of whether the petition is motivated by an improper purpose, even where the petitioning has anticompetitive effects. See Eastern R. R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 138 (1961); United Mine Workers v. Pennington, 381 U.S. 657, 660–61 (1965); cf. City of Columbus v. Omni Outdoor Adver., Inc., 499 U.S. 365, 379–80 (1991) ("The federal antitrust laws do not regulate the conduct of private individuals in seeking anticompetitive action from the government.").

On appeal, the Third Circuit affirmed dismissal of the antitrust challenge to the MSA on the grounds of the Noerr-Pennington doctrine. Then, while acknowledging that it did not need to reach the question of Parker immunity because it had affirmed on the basis of Noerr-Pennington, it did so anyway and concluded that immunity under Parker was not appropriate under the circumstances presented there.

In conducting its analysis of the applicability of Parker, the Third Circuit made several important observations: First, it noted that, under Parker, "[a]ntitrust laws do not bar anticompetitive restraints that sovereign states impose 'as an act of government,' " id. at 254 (quoting Parker, 317 U.S. at 352), and that the "key question is whether the allegedly anticompetitive restraint may be considered the product of sovereign state action." Id. The court also noted that because the Parker doctrine "is grounded in federalism and respect for state sovereignty, this interest in protecting the acts of the sovereign state, even if anticompetitive, outweighs the importance of a freely competitive marketplace, especially in the absence of contrary congressional intent." Id. at 254–55. Thus, even if "individual acts of state governments may be considered unwise or counterproductive, the decision to make such choices lies within the sovereign power of the states." Id. at 255.

Parker, however, only applies to actions by a *state* acting in its sovereign capacity.[13] According to the Third Circuit, "[o]nly an affirmative decision by the state itself, acting in its sovereign capacity . . . can immunize otherwise anticompetitive activity." A.D. Bedell, 263 F.3d at 255. The threshold

---

[13]While Parker immunizes state action only, private parties affected by the state action must also be immune in order to give effect to Parker immunity. See A.D. Bedell, 263 F.3d at 256 n.35. "Otherwise, plaintiffs could sue only the private parties and by winning antitrust judgments against them, could thwart state policies as if there were no state [i]mmunity." Id. (citation omitted).

question for determining whether Parker immunity attaches, therefore, is whether the action in question qualifies as an affirmative act by the state itself. If it is not altogether clear whether an act should be treated as state action for purposes of Parker immunity, courts apply the test set forth in California Retail Liquor Dealers Association v. Midcal Aluminum, Inc., 445 U.S. 97 (1980). A.D. Bedell, 263 F.3d at 255–56 (quoting Patrick v. Burget, 486 U.S. 94 (1988)). In Midcal, the Supreme Court clarified that Parker requires states to meet two conditions before antitrust immunity will attach: "First, the challenged restraint must be 'one clearly articulated and affirmatively expressed as state policy'; second, the policy must be 'actively supervised' by the State itself." Midcal, 445 U.S. at 105 (quoting City of Lafayette v. La. Power & Light Co., 435 U.S. 389, 410 (1978)).

As the Third Circuit acknowledged, however, "[a]pplying Midcal is unnecessary if the alleged antitrust injury was the direct result of a clear sovereign state act." A.D. Bedell, 263 F.3d at 256 (citing Mass. Sch. of Law v. Am. Bar. Ass'n, 107 F.3d 1026, 1036 (3d Cir. 1997) (holding that "where states are sovereign" in imposing the allegedly anticompetitive restraints, the Midcal test was inapplicable); Sessions Tank Liners, Inc. v. Joor Mfg., Inc., 17 F.3d 295, 299 (9th Cir. 1994) (finding immunity from antitrust liability where plaintiff's alleged injuries arose directly from government action); PTI, Inc. v. Philip Morris, Inc., 100 F. Supp. 2d 1179, 1195–96 (C.D. Cal. 2000) ("The test to determine sufficient state involvement as sovereign is unnecessary when the state legislature or state supreme court acts directly.")).

Having made this observation, the Third Circuit concluded that, while the MSA itself was arguably the direct result of state government action, the anticompetitive injury at issue allegedly "resulted from tobacco companies' conduct after implementation of the [MSA], and not from any further positive action by the state." A.D. Bedell, 263 F.3d at 258. Because the lawsuit named the major tobacco companies as defendants rather than the state itself, the court found the situation analogous to that of Midcal and, applying Midcal, found a clearly articulated state policy but insufficient active supervision by the state of the allegedly anticompetitive restraints. Notwithstanding this analysis, as indicated above, the Third Circuit affirmed the district court's dismissal of the antitrust challenge on the grounds that the challenged activities—again, the negotiation and execution of the MSA—were exempt

21

from liability under Noerr-Pennington anyway.

Subsequently, in Mariana v. Fisher, individual smokers in the State of Pennsylvania brought suit against Pennsylvania's Secretary of Revenue and Attorney General in their official capacities, challenging the implementation and enforcement of the MSA on the grounds that it violated the Sherman Act.[14]  The district court dismissed the antitrust claims and the Third Circuit affirmed, following Bedell,[15] on the basis that the Noerr-Pennington doctrine extended immunity to the state actors as well as to private actors involved in the negotiation and execution of the MSA.  Mariana, 338 F.3d at 200. Then, again based on Bedell, the Mariana court held that the state actors in that case were not subject to Parker immunity.  Id. at 203–04 (noting that the Bedell court, "[p]erhaps unintentionally, because the issue was not before it, . . . seems to have assumed, if not decided, that the States have no Parker immunity.  Accordingly we, as did Bedell for the Majors, hold that the State officials are not entitled to Parker immunity" for the execution of the MSA).[16]

The Second Circuit likewise purported to apply Bedell in the recent case of Freedom Holdings, Inc. v. Spitzer.  There, plaintiffs were cigarette importers[17] who brought suit against the Attorney General and the Commissioner of Taxation and Finance for the State of New York.  Rather than attacking the MSA itself or New York's version of the Escrow Statute, however, plaintiffs challenged New York's so-called "Contraband Statutes,"[18] passed in connection with the MSA, on the grounds that

----

[14]Plaintiffs also alleged violations of the Commerce Clause and Compact Clause.

[15]The Mariana court noted that the four major tobacco companies were not named as defendants there as a result of its decision in A.D. Bedell that the "Majors" were immune from antitrust liability under the Noerr-Pennington doctrine.  338 F.3d at 193.

[16]This Court is not persuaded that Bedell required the conclusion reached in Mariana, as Bedell expressly recognized that direct state action was exempt from antitrust challenges and that the anticompetitive injury at issue in Bedell allegedly "resulted from tobacco companies' conduct after implementation of the [MSA], and not from any further positive action by the state."  A.D. Bedell, 263 F.3d at 258.

[17]ITP was one of the plaintiffs in that case and was represented by the same counsel as Plaintiffs here.

[18]New York's Contraband Statutes served to "bolster the State's ability to enforce" the Escrow Act, by requiring each cigarette manufacturer to certify annually that such manufacturer is either a PM making payments under the MSA or an NPM making payments under the Escrow Act; barring tax

they conflicted with federal antitrust law and violated plaintiffs' constitutional rights.

The district court granted defendants' Rule 12(b)(6) motion to dismiss in part based on its finding that the statutes at issue constituted unilateral state action and therefore were exempt from federal antitrust laws under Parker. The Second Circuit reversed the dismissal of the antitrust claims. In reaching its conclusion, the court first reviewed the history of the execution of the MSA, and accepted as true, for purposes of the 12(b)(6) motion, plaintiffs' allegations that the "market-share provisions [of the MSA] constitute an 'output cartel' that prevents price competition, leads to monopoly prices, and encourages Settling States to protect the cartel in order to preserve the revenue flow to the States [and that] the effect of the market-share provisions is to deter competition among and between OPMs and SPMs." Freedom Holdings, 357 F.3d at 211. The court further assumed, based on plaintiffs' allegations, that New York's version of the Escrow Act, "by compelling NPMs to make payments—either by joining the MSA or by complying with the Escrow Statute—according to increased market share, effectively relieves the OPMs of price competition." Id. at 213. Plaintiffs alleged that the Contraband Statutes conflicted with antitrust law in that they implemented the "output cartel" created under the MSA and the Escrow Act. Id. at 215.

In conducting its antitrust analysis, the Second Circuit first stated its opinion that the question of whether a state statute that restrains competition among private firms is preempted by the Sherman Act "is determined by a two-step analysis." Id. at 222. First, the plaintiff must show that

> the scheme of market control created by the statute would constitute a *per se* violation of the Sherman Act if brought about by an agreement among private parties. A statute will be preempted by the Sherman Act only if it 'mandates or authorizes conduct that necessarily constitutes a violation of the antitrust laws in all cases, or if it places irresistible pressure on a private party to comply with the statute.' For a statute to be preempted, the conduct contemplated by the statute must be 'in all cases a *per se* violation' of the federal antitrust laws.

Id. at 222–23 (internal citations omitted). If the plaintiff makes the requisite showing, then the court must consider whether the alleged anticompetitive scheme is nonetheless immunized under Parker.

---

stamp agents from affixing tax stamps to cigarettes if the manufacturer has not provided the required certification; and rendering any cigarettes imported into the state in violation of the Escrow Act or Contraband Statutes subject to seizure and forfeiture. See Freedom Holdings, 357 F.3d at 213–14 (referencing N.Y. Tax Law §§ 480–b, 481(c), and 1846)).

"A statute that permits or compels private parties to engage in *per se* violations of the antitrust laws will be saved from preemption if: (i) the restraint in question is 'clearly articulated and affirmatively expressed as state policy,' and (ii) the policy is 'actively supervised' by the state itself." Id. at 223 (internal citations omitted; quoting, among others, Midcal, 445 U.S. at 101, 105).

In setting forth the standards according to which it would analyze the legislation at issue, the Second Circuit expressly rejected the defendants' argument that the statutes were a product of "unilateral state action" and therefore could not constitute a *per se* violation of the Sherman Act, since the Act, by its terms, applied only to private "contract[s], combination[s] or conspirac[ies]." Id. at 223. To the contrary, the court found that "where the anticompetitive effects of a state statute obviate the need for private parties to act on their own to create an anticompetitive scheme, the statute may be attacked as a 'hybrid' restraint on trade." Id. (quoting 324 Liquor Corp. v. Duffy, 479 U.S. 335, 345 n.8 (1987) ("Where private actors are granted a degree of private regulatory power [by a state] the regulatory scheme may be attacked under § 1 as a 'hybrid' restraint . . . . [T]he federal antitrust laws pre-empt state laws authorizing or compelling private parties to engage in anticompetitive behavior.")

In that light, the court found that the "Contraband Statutes allegedly enforce an express market-sharing agreement among private tobacco manufacturers [e.g., the MSA]," and therefore, even if a "contract among private parties [were] required in the first step of preemption analysis," it existed in that case as a hybrid restraint, at a minimum. 357 F.3d at 224. Further, based on the allegations in the complaint, the court held that the government behavior at issue ("i.e., enforcement of the alleged output cartel") would be a *per se* Sherman Act violation if done by private agreement. Id. at 225. The court then held that, although Parker stood for the premise that states had the ability to promulgate anticompetitive regulations in furtherance of legitimate state policy goals, "a state cannot simply give immunity to those who violate the Sherman Act by authorizing them to violate it, or by declaring that their action is lawful." 357 F.3d at 226 (quoting Parker, 317 U.S. at 350–51).

Accordingly, the Second Circuit went on to apply the Midcal test to the state statutes at issue and determined that, while the MSA as well as passage of the Escrow Act and Contraband Statutes were "express acts of the State of New York," the alleged anticompetitive scheme was not sufficiently

24

supervised by the state and therefore the second <u>Midcal</u> prong was not met.  <u>Freedom Holdings</u>, 357 F.3d at 231–32.  On that basis, the court denied the state defendants' 12(b)(6) motion to dismiss the antitrust claims against them.[19]

The decision in <u>Freedom Holdings</u>, however, has not been universally followed outside the Second Circuit.  For example, in <u>Sanders v. Lockyer</u>, 365 F. Supp. 2d 1093 (N.D. Cal. Mar. 28, 2005), upon whose reasoning Defendant relies, the plaintiff was a smoker who purported to represent a class of California consumers who purchased cigarettes manufactured by one or more of the four OPMs, all of whom were named as defendants in the case along with the Attorney General of California.  The suit, like the case at bar, challenged the MSA itself as an "anticompetitive hybrid agreement" and also challenged California's version of the Escrow Act and Contraband Statute on the grounds that the legislation had been passed in order to permit the defendant tobacco companies to "further protect[ ] their market dominance" and to "dramatically increase[ ] the price of cigarettes."  <u>Id.</u> at 1096.

In considering whether California's ratification of the MSA and subsequent passage of the complementary legislation were subject to challenge on the grounds that they violated the Sherman Act, the district court in <u>Sanders</u> considered whether state-action immunity applied.  The court noted that the state action doctrine provides that when a state exercises its authority and enacts a statute or regulation with anticompetitive effects, the state and private parties acting at its direction are not liable for antitrust violations.  <u>Id.</u> at 1098 (citing <u>Parker v. Brown</u>, 317 U.S. 341, 350–52 (1943); <u>PTI v. Philip Morris, Inc.</u>, 100 F. Supp. 2d 1179, 1196 (C.D. Cal. 2000)).  The court acknowledged that the doctrine does not apply when the state acts as a "participant in a private agreement or combination by others

---

[19]In analyzing the first <u>Midcal</u> prong—whether the restraint in question is "clearly articulated and affirmatively expressed as state policy"—the Second Circuit recognized that the statutes at issue were direct legislative activity, but nonetheless found that  the "ancillary purpose of this <u>Midcal</u> prong . . . is to reveal the State's purposes in agreeing to, and enforcing, the MSA's market-share provisions.  These purposes must be known to ensure that the State's policy goals are sufficient to qualify for the <u>Parker</u> immunity—simply protecting private parties from competition is not a sufficient goal."  <u>Id.</u> at 227 (citing <u>Parker</u>, 317 U.S. at 351–52).  The court then conducted a lengthy analysis of the issue, concluding finally that the state had adequately articulated its purposes but had not demonstrated that the legislation in question would actually further the supposed policy goals.  The court's ultimate holding was not, however, based on that finding.  <u>See Freedom Holdings</u>, 357 F.3d at 227–31; <u>cf. Freedom Holdings v. Spitzer</u>, 363 F.3d 149, 155–57 (2d Cir. 2004) (denying petition for rehearing, but clarifying that it had not relied upon the first prong of the <u>Midcal</u> test in reaching its original holding).

for restraint of trade." Id. (quoting Parker, 317 U.S. at 351–52).

The Sanders court also recognized the two-prong test created by the Supreme Court in Midcal, but pointed out that subsequent to Midcal, the Supreme Court has held that "when a state legislature adopts legislation, its actions constitute those of the State, and *ipso facto* are exempt from the operation of the antitrust laws." Hoover v. Ronwin, 466 U.S. 558, 567–68 (1984). In Hoover, the Supreme Court further observed:

> In cases involving the anticompetitive conduct of a nonsovereign state representative the Court has required a showing that the conduct is pursuant to a "clearly articulated and affirmatively expressed state policy" to replace competition with regulation. The Court has also found the degree to which the state legislature or supreme court supervises its representative to be relevant to the inquiry. *When the conduct is that of the sovereign itself, on the other hand, the danger of unauthorized restraint of trade does not arise. Where the conduct at issue is in fact that of the state legislature or supreme court, we need not address the issues of "clear articulation" and "active supervision."*

Hoover, 466 U.S. at 569 (citations omitted; emphasis added), quoted in Sanders, 365 F. Supp. 2d at 1099.

Thus, the Sanders court considered Midcal to be tempered by the Supreme Court's decision in Hoover and concluded that "the threshold inquiry is whether the challenged action is a sovereign act by the state or the conduct of private persons." Sanders, 365 F. Supp. 2d at 1099. In that light, the Sanders court held that the statutes at issue constituted direct legislative activity and as such were not subject to review under the Midcal standard. The court expressly disagreed with the holding in Freedom Holdings and held that, under the state-action doctrine, the legislation at issue was the product of the state's exercise of its sovereign authority and the state Attorney General, acting at its direction, was immune from antitrust liability. Id. at 1099–1101.

Having determined that the Attorney General could not be held liable for antitrust violations, the Sanders court also went on to consider whether the legislation at issue was preempted by the Sherman Act. If a challenged scheme constitutes a *per se* violation of the Sherman Act, then state-action immunity would not necessarily apply, and preemption may exist. See Sanders, 365 F. Supp. 2d at 1101. "A challenged state statute is a *per se* violation if, on its face, it 'mandates or authorizes conduct that necessarily constitutes a violation of the antitrust laws in all cases, or if it places irresistible pressure on private parties to violate the antitrust laws in order to comply with the statute.' " Id. (quoting

26

Rice v. Norman Williams Co., 458 U.S. 654, 661 (1982)). Analysis of the issue of preemption devolves upon "whether there exists an irreconcilable conflict between the federal and state regulatory schemes." Id. (quoting Rice, 458 U.S. at 659). Noting that "hypothetical or potential conflict is insufficient to warrant the preemption of the state statute," id. (quoting Rice, 458 U.S. at 659), the Sanders court determined as a matter of law that neither the MSA nor the complementary legislation was preempted because "the challenged statutes do not permit tobacco manufacturers to fix prices, limit output, divide markets, or engage in violations of the antitrust laws." Id.

Last, because the plaintiff in Sanders appeared to challenge the MSA itself and not only the state legislation implementing it, the court went on to consider whether such a challenge was barred by the Noerr-Pennington doctrine. As the court noted, the issue was whether Noerr-Pennington "applies only to the acts of petitioning themselves or whether it extends to the resulting government action, including a litigation settlement like the MSA." Id. at 1102. Citing Bedell as well as other courts considering the same issue, the court concluded that Noerr-Pennington immunity applied to the MSA as the direct result of protected petitioning activity. Id.[20]

### (2) Application Of Antitrust Law To the Facts Of This Case

This Court finds the reasoning of Sanders v. Lockyer to be persuasive and therefore holds that the enforcement and application of both the Escrow Act, as amended by the ASR Amendment, and the Contraband Statute, as express actions of the sovereign state of Tennessee, "*ipso facto* are exempt from the operation of the antitrust laws." Hoover v. Ronwin, 466 U.S. 558, 567–68 (1984). Defendant, the Attorney General for Tennessee, acting at the direction of the state legislature, is therefore immune from antitrust liability. Cf. Sanders, 365 F. Supp. 2d at 1100–01.

---

[20]Other courts have reached similar conclusions. See, e.g., PTI, Inc. v. Philip Morris, Inc., 100 F. Supp. 2d 1179, 1196 (C.D. Cal. 2000) (holding that private defendants were immune under the Noerr-Pennington doctrine from antitrust liability for participation in creation of the MSA, and finding that California's tobacco statutes constituted direct legislative activity that was immunized as state action, rejecting application of Midcal because direct legislative action rendered the Midcal analysis "superfluous"); Hise v. Philip Morris, Inc., 46 F. Supp. 2d 1201 (N.D. Okla. 1999), aff'd, 208 F.3d 226, 2000 WL 192892 (10th Cir. 2000), cert. denied, 531 U.S. 959 (2000) (granting summary judgment for defendants in suit brought by smokers alleging antitrust violations arising out of the negotiation and execution of the MSA in part on the basis of the Noerr-Pennington doctrine); Forces Action Project LLC v. California, 2000 WL 20977, at *8 (N.D. Cal. Jan. 5, 2000) (same).

27

Moreover, the legislative scheme at issue is not preempted by the Sherman Act as a "*per se*" violation thereof, because it neither "mandates [nor] authorizes conduct that necessarily constitutes a violation of the antitrust laws in all cases," nor "places irresistible pressure on private parties to violate the antitrust laws in order to comply with the statute." Cf. Sanders, 365 F. Supp. 2d at 1101; see also McNeilus Truck & Mfg., Inc. v. State ex rel. Montgomery, 226 F.3d 429, 440 (6th Cir. 2000) ("[A] state statute, when considered in the abstract, may be condemned under the antitrust laws only if it mandates or authorizes conduct that necessarily constitutes a violation of the antitrust laws in all cases, or if it places irresistible pressure on a private party to violate the antitrust laws in order to comply with the statute.") (quoting Rice, 458 U.S. at 661).

Further, to the extent Plaintiffs' Complaint can be construed as including a challenge to the MSA itself, the Court finds the MSA is likewise not preempted by the Sherman Act. As stated in Sanders:

> The key allegation of plaintiff's Sherman Act claim is that the MSA creates an incentive for the manufacturer defendants to raise prices in parallel fashion, since a price increase by one OPM alone would increase market share for the others as well as for the SPMs, resulting in their having to make higher payments under the settlement. This scenario presents a "hypothetical" or "potential" conflict with the Sherman Act, but not the "irreconcilable" conflict required for preemption. . . . Taking all of plaintiff's allegations as true, the Court cannot conclude that the MSA authorizes collusive or concerted action on the part of the manufacturers to raise prices to monopolistic levels.

Sanders, 365 F. Supp. 2d at 1101.

Even if the MSA could be challenged as a *per se* Sherman Act violation, however, such a challenge would be barred by the Noerr-Pennington doctrine. As did the Sanders court and the Third Circuit before it in Bedell, this Court concludes that the Noerr-Pennington doctrine does not only apply "to the acts of petitioning themselves," but also "extends to the resulting government action, including a litigation settlement like the MSA." Sanders, 365 F. Supp. 2d at 1102. As another district court in California explained, Plaintiffs "could not seriously allege that the MSA is a sham. Far from an objectively baseless attempt to harm [the Majors'] competitors, the MSA reflects a genuine, ultimately successful attempt to settle extensive current and potential litigation." PTI, 100 F. Supp. 2d at 1193. The settlement is a sovereign act of the state of Tennessee and "Noerr-Pennington immunity applies to the MSA as the direct result of protected petitioning activity." Sanders, 365 F. Supp. 2d at 1102.

Finally, to the extent Plaintiffs challenge the subject legislation and the MSA as "hybrid"

restraints calling for analysis under <u>Midcal</u>, this Court again concurs with the <u>Sanders</u> court in finding that a hybrid restraint is a government action delegating regulatory power to private parties so that they can enforce their own private market decisions. <u>Sanders</u>, at 1104 (citing <u>Rice</u>, 458 U.S. at 665, among others). Neither the MSA nor Tennessee's Tobacco Statutes authorize collusive action among the participating tobacco manufacturers, nor do they give tobacco manufacturers regulatory authority to set prices in the cigarette market. Instead, the MSA simply imposes unilateral payment obligations on OPMs and SPMs, and the Tobacco Statutes require escrow contributions from the NPMs such as Plaintiffs here. Consequently, neither the MSA nor the Tobacco Statutes can legitimately be characterized as hybrid restraints. Cf. <u>Jackson, Tenn. Hosp. Co. v. W. Tenn. Healthcare, Inc.</u>, 414 F.3d 608, 611 and n.5 (6th Cir. July 11, 2005) (dismissing antitrust claims brought against a subdivision of the state government on the grounds that the state-action doctrine protected the government entity from liability, and expressly rejecting consideration of whether there was "active state supervision," stating: "[I]t is well established that antitrust law does not apply to states acting as sovereigns. The Supreme Court has determined that principles of federalism and state sovereignty provide blanket protection for states.").

Accordingly, the Court grants Defendant Summer's motion to dismiss the antitrust claims asserted in Plaintiffs' Complaint.

### D. Plaintiffs' Constitutional Claims

#### (1) Due Process Under the Fourteenth Amendment

Plaintiffs contend that retroactive application of the ASR Amendment and the enforcement of the Tobacco Statutes violates their substantive and procedural due process rights. In their response in opposition to summary judgment, Plaintiffs contend more specifically that Tennessee's Tobacco Statutes violate substantive due process because they are arbitrary and not rationally related to any legitimate state objective; rather, their only purpose is "to destroy NPM competition." (See Doc. No. 52, at 23.) Plaintiffs claim the Statutes violate procedural due process requirements because they "constitute a prejudgment deprivation of property without the procedural protections required by the Due Process Clause." (Doc. No. 52, at 24.) Defendant, on the other hand, argues simply that Plaintiffs

cannot carry their burden of proving the statutes are arbitrary and irrational, and that a general legislative directive cannot violate due process.  (Doc. No. 36, at 18, 19.)

       *(a)  Substantive Due Process and Enforcement of the Tobacco Statutes*

The Supreme Court has held that the Due Process Clause includes a substantive component that provides some protection against economic legislation interfering with property interests.  See, e.g., Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for So. Cal., 508 U.S. 602, 636–37 (1993).  This protection is severely limited, however, because economic legislation, to comport with due process, needs only to be rationally related to a legitimate government interest.  Concrete Pipe, 508 U.S. at 637; In re Blue Diamond Coal Co., 79 F.3d 516, 521 (6th Cir. 1996) ("Legislative acts 'adjusting the burdens and benefits of economic life' are presumed constitutional.") (quoting Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 15 (1976)).  Moreover, "the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way."  Turner Elkhorn, 428 U.S. at 15.  In fact, as the Sixth Circuit has noted, plaintiffs challenging an economic statute on substantive due process grounds must traverse "unusually inhospitable legal terrain" because the Supreme Court has not invalidated an economic statute on substantive due process grounds since it decided Railroad Retirement Board v. Alton Railroad Co., 295 U.S. 330, in 1935.  Blue Diamond Coal, 79 F.3d at 521.

Economic legislation is not unconstitutional under the Due Process Clause "solely because it upsets otherwise settled expectations" or because it "impose[s] a new duty or liability based on past acts."  Concrete Pipe, 508 U.S. at 637 (citations omitted).  Moreover, the legislature is not required to ensure "mathematical precision in the fit between justification and means" when enacting economic legislation, id. at 639, and "the law need not be in every respect logically consistent with its aims to be constitutional.  It is enough that there is an evil at hand for correction, and that *it might be thought that the particular legislative measure was a rational way to correct it.*"  Williamson v. Lee Optical of Okla., Inc., 348 U.S. 483, 487–88 (1955) (emphasis added).  In other words, the legislation at issue must have "some conceivable purpose that is not prohibited by the Constitution," Star Scientific, Inc. v. Beales, 278 F.3d 339, 350 (4th Cir. 2002) (citing Lee Optical, 348 U.S. at 487; Minnesota v. Clover Leaf Creamery

<u>Co.</u>, 449 U.S. 456, 463 n.7 (1981)), so it makes no difference whether that purpose is spelled out in an express "purposes" provision incorporated within the challenged legislation or in recorded legislative history.

Faced with this extremely high standard, Plaintiffs argue that the only possible purpose of the Tobacco is an improper one, that is, "to destroy NPM competition." (Doc. No. 52, referencing Compl. ¶¶ 34, 37, 43.) The maintenance of the funds in escrow for twenty-five years allegedly puts NPMs at "a severe competitive disadvantage" because such payments are not tax deductible while PMs' payments under the MSA are tax deductible. (<u>See</u> Doc. No. 52, at 24.) Further, Plaintiffs argue that Tennessee's asserted rational basis for the legislation, proffered in the form of "unsworn statements in [the Defendant's] Memo of Law," fails because Tennessee has never sued any NPM for cigarette-related health costs and is expressly preempted from doing so by the Federal Cigarette Labeling & Advertising Act, 15 U.S.C. § 1331 *et seq.* ("FCLAA"). (Doc. No. 52, at 24.)

In fact, without performing an in-depth analysis of the FCLAA, the Court finds that, contrary to Plaintiffs' unsupported representation, that Act only preempts states from requiring additional statements on cigarette packaging other than those required by federal law, and also bars additional state law "prohibitions based on smoking and health . . . with respect to the advertising or promotion" of cigarettes labeled in conformity with federal law. 15 U.S.C. § 1334. Plaintiffs' argument in that regard clearly fails as the Tennessee Tobacco Statutes does not impose any requirements upon Plaintiffs pertaining to labeling or promotion, much less any that conflict with federal law.

Moreover, under the deferential standard referenced above, the Defendant clearly succeeds in positing a conceivable, constitutionally permissible purpose for the Tobacco Statutes. Defendant argues that the Escrow Act was enacted "to protect Tennessee's citizens by ensuring that sufficient funds are available to compensate Tennessee for its expenses in covering the costs caused by an NPM's tobacco products and to prevent NPMs from taking a free ride on the costs their products impose on Tennessee." (Doc. No. 36, at 18.) Further, Defendant argues that the Escrow Act is "directly related to the physical health and fiscal well-being of the citizens of Tennessee." (<u>Id.</u>) The Defendant points out that PMs pay similar per-cigarette amounts, with added restrictions on their ability

31

to market their products, to which NPMs are not subject, which "demonstrates conclusively that Tennessee's statutes are not arbitrary or irrational." (Id.)  In addition, each NPM's obligation under the Escrow Act depends on the number of cigarettes it sells in Tennessee, and the Act minimizes an NPM's obligation because it provides for interest payments to the NPM on the amounts in escrow and for reversion of the funds to the NPM after twenty-five years if there are no health claims in Tennessee related to the NPM's products in the interim.  Further, the NPM can obtain a release of any amount it establishes it paid in excess of what it would have had to pay if it had become a PM.  (Id. at 18–19.) Defendant also argues that the ASR Amendment "merely levels the playing field to prevent some NPMs from obtaining an unfair competitive advantage by concentrating their sales in a small geographic area." (Id. at 19.)  The Contraband Statute, considered as distinct from the Escrow Act, does not impose any substantive requirements upon NPMs at all.  It simply functions as a mechanism for control over the entry of cigarette manufacturers and importers into the market in Tennessee and the enforcement of the Escrow Act with respect to each such manufacturer or importer.  Further, if  the Escrow Act itself is deemed to pass constitutional muster, the Contraband Statute necessarily does so as well, since it poses no additional obstacles.

        In addition to the rationale posited by Defendant, the "Findings and Purpose" section set forth in the Model Act proposed by the MSA, also articulates a conceivable rational purpose behind the challenged legislation:  The Model Act sets forth the basis for execution of the MSA in the first place, and further provides that "[i]t would be contrary to the policy of the State if tobacco product manufacturers who determine not to enter into [the MSA] could use a resulting cost advantage to derive large, short-term profits in the years before liability may arise without ensuring that the State will have an eventual source of recovery from them if they are proven to have acted culpably.  It is thus in the interest of the State to require that such manufacturers establish a reserve fund to guarantee a source of compensation and to prevent such manufacturers from deriving large, short-term profits and then becoming judgment-proof before liability may arise."  (MSA, Ex. T.)  This explanation also gives credence to the purpose of the ASR Amendment as articulated by the Defendant:  To the extent NPMs such as Plaintiffs who sell in limited geographic areas were able to obtain a refund of the vast majority

of the funds deposited into escrow under the Escrow Act as originally drafted, the Act was not achieving its presumed purpose of requiring NPMs to establish significant reserve funds from which damages judgments might be paid.

Thus, while the Court recognizes (1) the significant financial burden that the escrow payments—and the loss of use of a significant amount of money for twenty-five years—create for any NPM; and (2) that Tennessee could likely accomplish the same end through less burdensome means, it is equally true that Tennessee could have enacted even more burdensome legislation—such as imposing a tax on NPMs while allowing a tax credit to the PMs. Cf. Star Scientific, 278 F.3d at 350. Instead, the NPMs currently receive interest on the escrow payments and the full principal not used to pay judgments after twenty-five years. The Court cannot say that this mechanism is not rationally related to the presumed purpose of the statute: to reduce smoking among Tennesseans and to reduce or help defray some of the costs related to caring for smoking-related illnesses. If the NPMs were not subject to any controls similar to those imposed upon the PMs under the MSA, then they could take advantage of the fact that they are not subject to any payment requirements or restrictions on marketing to build their businesses to such a degree that the settlement with the PMs would have limited efficacy. It is irrelevant that some other form of legislation might have worked more effectively. See Lee Optical, 348 U.S. at 487 ("[I]t is for the legislature, not the courts, to balance the advantages and disadvantages [of economic legislation].")

The Court therefore cannot conclude that the Tennessee legislature "acted in an arbitrary and irrational way" when it passed the Escrow Act, the Contraband Statute or the ASR Amendment. Defendant's motion to dismiss Plaintiffs' substantive due process claim is therefore granted. To be clear, Defendant's motion does not address the issue of the alleged retroactive application of the ASR Amendment and this ruling should not be construed to dismiss Plaintiffs' claim that such retroactive application violates their substantive due process rights. That claim is the subject of Plaintiffs' pending Motion for Partial Summary Judgment and will be addressed in the Court's eventual ruling on that motion.

*(b) Procedural Due Process*

As indicated above, Plaintiffs claim that the Tobacco Statutes, including the ASR Amendment, "constitute a prejudgment deprivation of property without the procedural protections required by the Due Process Clause." (Doc. No. 52 at 24.) In his motion to dismiss, Defendant argues that Plaintiffs suffer no actual deprivation of property, so their procedural due process claim must fail. Alternatively, Defendant argues that a generally applicable legislative directive affords Plaintiffs no procedural due process rights, citing County Line Joint Venture v. City of Grand Prairie, 839 F.2d 1142, 1144 (5th Cir. 1988). In response, Plaintiffs contend that (1) they have suffered a deprivation of property and (2) the statutes at issue are not "generally applicable" since they do not apply to all cigarette manufacturers selling products in Tennessee, but only to those who have not signed the MSA. Further, Plaintiffs argue under Fuentes v. Shevin, 407 U.S. 67 (1972), and Bell v. Burson, 402 U.S. 540 (1971), that a pre-deprivation hearing is constitutionally mandated because the statutes at issue require Plaintiffs essentially to post security to cover damages for which they might become liable sometime in the future. Specifically, Plaintiffs claim that "due process require[s] that there must first be a hearing to determine whether there is a 'reasonable possibility' of a judgment in the amounts claimed . . . because 'the statutory scheme makes liability an important factor in the State's determination to deprive an individual of [its property].' " (Doc. No. 52, at 27 (quoting Bell, 402 U.S. at 541).)

Plaintiffs are, in fact, correct that "it is now well settled that a temporary, nonfinal deprivation of property is nonetheless a 'deprivation' in the terms of the Fourteenth Amendment." Fuentes, 407 U.S. at 84–85 (citations omitted). In the case at bar, Plaintiffs' obligation to place substantial amounts of money into an escrow account for a period of twenty-five years clearly qualifies as a deprivation of property, regardless of whether they maintain equitable ownership of and receive interest payments on the funds in the account.

Contrary to Plaintiffs' contention, however, the Tobacco Statutes apply equally to all cigarette manufacturers or importers that sell cigarettes within Tennessee: They are all required either to join the MSA or to abide by the terms of the Escrow Act. "Governmental determinations of a general nature that affect all equally do not give rise to a due process right to be heard." Nasierowski Bros. Inv. Co. v. City of Sterling Heights, 949 F.2d 890, 896 (6th Cir. 1991); see also Bi-Metallic Inv. Co. v. State Bd.

34

of Equalization, 239 U.S. 441, 445 (1915) ("Where a rule of conduct applies to more than a few people, it is impracticable that everyone should have a direct voice in its adoption. The Constitution does not require all public acts to be done in town meeting or an assembly of the whole. General statutes within the state power are passed that affect the person or property of individuals, sometimes to the point of ruin, without giving them a chance to be heard. Their rights are protected in the only way that they can be in a complex society, by their power, immediate or remote, over those who make the rule."); Halverson v. Skagit County, 42 F.3d 1257, 1260 (9th Cir. 1994) ("When the action complained of is legislative in nature, due process is satisfied when the legislative body performs its responsibilities in the normal manner prescribed by law.") (citation omitted). The cases cited by Plaintiffs are inapposite and do not compel a contrary conclusion, as those cases generally concern the validity of statutes that provide a mechanism for private individuals, under guise of official government action, to take the property of others prior to notice and a hearing.[21]

Accordingly, because procedural due process does not require a pre-deprivation hearing in this context, the Court grants Defendant's motion to dismiss Plaintiffs' claim that the enactment and enforcement of the Tobacco Statutes violates their due process rights under the Fourteenth Amendment.[22] Again, this ruling should not be construed to dismiss Plaintiffs' claim that retroactive

---

[21]Fuentes involved prejudgment replevin statutes that permitted creditors to take chattels from their possessor without allowing the putative debtor a prior opportunity to be heard, 407 U.S. at 82; see also Connecticut v. Doehr, 501 U.S. 1 (1991) (a state statute that authorized a judge to allow the prejudgment attachment of real estate without prior notice or hearing, simply upon the plaintiff's verification that there is probable cause to sustain the validity of his or her claim, was unconstitutional); North Ga. Finishing, Inc. v. Di-Chem, Inc., 419 U.S. 601 (1975) (striking down a statute that permitted a writ of garnishment to be issued in pending suits by a court clerk without participation by a judge, simply on an affidavit of the plaintiff or his attorney containing conclusory allegations).
    In Bell, a statute provided that the motor vehicle registration and driver's license of an uninsured motorist involved in an accident would be suspended unless he posted security to cover the amount of damages claimed by aggrieved parties in reports of the accident. 402 U.S. at 536. The Court found that due process in that situation required, at a minimum, "a forum for the determination of the question whether there is a reasonable possibility of a judgment being rendered against him as a result of the accident." Id. at 542. The Court also noted that if the statute at issue had "barred the issuance of licenses to all motorists who did not carry liability insurance or who did not post security, the statute would not, under our cases, violate the Fourteenth Amendment." Id. at 539.

[22]The United States District Court for the Eastern District of Louisiana recently reached the same conclusion, in a virtually identical lawsuit, but on different grounds. See Xcaliber Int'l Ltd. v. Ieyoub, 377 F. Supp. 2d 567 (E.D. La., Feb. 4, 2005). The court there assumed, without analysis, that a deprivation of property had occurred and that some degree of due process was warranted to justify

35

application of the ASR Amendment violates their procedural due process rights.

### (2) Equal Protection Under the Fourteenth Amendment

Plaintiffs complain that enforcement of the Tobacco Statutes "violates [their] rights under the equal protection clause of the Fourteenth Amendment of the U.S. Constitution in that it constitutes discrimination against NPMs seeking to do business in Tennessee." (Compl. ¶ 98.) Plaintiffs do not contend that they are a suspect class entitled to heightened scrutiny under the Equal Protection Clause. Instead, they argue that the Tobacco Statutes are not rationally related to any legitimate government objective and that the reasoning behind the Statutes as suggested by the Defendant is "spurious." (Doc. No. 52, at 29.)

When no suspect classification nor infringement of a fundamental constitutional right is involved, equal protection challenges to economic legislation are subject to the highly deferential "rational basis" test, which simply asks whether the subject legislation is rationally related to a legitimate government interest. Under that test, a party challenging a statute on equal protection grounds "cannot prevail so long as . . . the question [of rationality] is at least debatable." PTI, 100 F. Supp. 2d at 1207 (quoting Minnesota v. Clover Leaf Creamery Co., 449 U.S. 456, 464 (1981)). In other words, this Court must uphold the challenged statute "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." Star Scientific, 278 F.3d at 351 (quoting FCC v. Beach Commc'n, Inc., 508 U.S. 307, 313 (1993)). The rational basis test is a "paradigm of judicial restraint." Beach Commc'n, 508 U.S. at 314. Consequently, "those attacking the rationality of the legislative classification have the burden to negative every conceivable basis which might support it. Moreover, . . . it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction

---

such deprivation. The court therefore applied the balancing test set forth in Mathews v. Eldridge, 424 U.S. 319 (1976), which requires consideration of (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute safeguards"; and (3) "the government's interest, including the function involved and fiscal and administrative burdens that the additional or substitute procedural requirements would entail." Id. at 335, quoted in Xcaliber, 377 F. Supp. 2d at 576. In light of that test, the court concluded that a hearing was not required under the circumstances because the risk of erroneous deprivation of the plaintiffs' property was minimal; additional safeguards would not significantly change the risk; and the government's interest in ensuring that "any judgment rendered against or settlement with the [NPMs] will be collectable." Id.

actually motivate the legislature." Id. at 315 (internal quotation marks and citations omitted).

As have most other courts to consider this issue in relation to similar or identical legislative schemes, we conclude that Plaintiffs here cannot meet this extremely difficult burden.[23] While it is true that the Escrow Act distinguishes among tobacco product manufacturers on the basis of whether they have or have not chosen to enter into the MSA, that distinction is rationally related to Tennessee's legitimate purpose of ensuring a source of recovery from *all* manufacturers for Tennessee's potential future costs related to cigarette smoking. Cf. Star Scientific, 278 F.3d at 351. As Defendant points out, the PMs, in exchange for immunity for any future liability to the state, make non-refundable payments under the Escrow Act in perpetuity and agree to significant restrictions on marketing and other activities. (See Doc. No. 36, at 22.) The NPMs, on the other hand, have not agreed to restrict their conduct in any way and are vulnerable to future lawsuits; notwithstanding, they, unlike the PMs, are entitled to interest on payments they make into escrow and to recover all amounts paid into escrow after twenty-five years if the money is not needed to pay a judgment or settle a lawsuit against them in the interim. The NPMs' escrow obligation is proportionate to their sales of cigarettes in Tennessee, particularly now that the ASR provision has been repealed, and is therefore reasonably related to the degree of harm the cigarettes have the potential to inflict on Tennessee's citizens and the state's treasury. The Contraband Statute serves the legitimate, rational purpose of preventing non-compliant manufacturers from selling their products in Tennessee. (Doc. No. 36, at 22–23.) Moreover, as other courts have found, reducing the total quantity of inexpensive cigarettes available within the state is a rational response to a known health threat. See, e.g., PTI, 100 F. Supp. 2d at 1207–08.

Plaintiffs argue that the different–and supposedly harsher—obligations imposed upon them are unjustified because (1) Plaintiffs have never been alleged to have participated in the OPMs' "decades-long cover-up regarding the health effects of smoking"; (2) NPMs do not direct billions of dollars to advertising at cigarette smokers, including minors; and (3) NPMs are exempt from future liability anyway as suits against them are preempted by the FCLAA. (See Doc. No. 52, at 28–29.) Even accepting as

---

[23]See, e.g., Star Scientific, 278 F.3d at 351; PTI, 100 F. Supp. 2d at 1208; Xcaliber v. Ieyoub, 377 F. Supp. 2d at 574.

true Plaintiffs' factual allegations regarding the real reasons behind the passage of these Statutes and the actual impact of the obligations upon them, Plaintiffs' arguments are unavailing. First, as indicated above, the FCLAA simply preempts suits against cigarette manufacturers related to packaging and labeling that meet federal standards. Second, regardless of what type of marketing and advertising Plaintiffs have historically conducted, the simple reality is that they are selling a product in Tennessee that the legislature has deemed to be potentially harmful. Thus, even if they, as NPMs, are not treated the same under Tennessee's statutory scheme as PMs, that does not mean that the distinctions are irrational or so unrelated to a legitimate purpose that they must be struck down under the Equal Protection Clause. Cf. Xcaliber v. Ieyoub, 377 F. Supp. 2d at 574–75.

The distinctions are rationally related to Tennessee's legitimate interest in assuring a future source for covering the social costs of cigarette smoking within the state from *all* manufacturers who might be held liable for such costs. The discrimination here is not "invidious" nor a "wholly arbitrary act." Dukes, 427 U.S. at 303–04. Under the rational-basis test, the Court concludes that Tennessee's Tobacco Statutes do not violate the Equal Protection Clause, and Defendant's motion to dismiss that claim must be granted.

### (3) First Amendment Claims

Finally, Plaintiffs allege that the enactment and enforcement of the Tobacco Statutes burdens their First Amendment rights of freedom of speech and freedom to petition. (Compl. ¶ 98.) They do not provide any further clarification in their Complaint as to how exactly their rights are curtailed, but in their response to Defendant's motion they claim that the Statutes violate Plaintiffs' First Amendment rights by "forcing NPMs to either attempt to join the MSA (thereby accepting its free speech restrictions) or do business under the onerous requirements of the Escrow Statute and ASR [Amendment]." (Doc. No. 52, at 29.). Essentially, Plaintiffs assert that the state is prohibited by the First Amendment from conditioning their choice to exercise their First Amendment rights upon their making escrow deposits.

Plaintiffs' arguments here are likewise unavailing. The Supreme Court has applied the "unconstitutional conditions" doctrine to analysis of restrictions on political and commercial speech rights. See, e.g., Perry v. Sindermann, 408 U.S. 593 (1972) (teaching position conditioned upon not

38

criticizing college administration); <u>Keyishian v. Bd. of Regents of Univ. of State of N.Y.</u>, 385 U.S. 589

(1967) (teaching position conditioned upon nonmembership in "subversive" organizations).   In <u>Perry</u>,

the Supreme Court explained the scope of this doctrine:

> For the last quarter-century, this Court has made clear that even though a person has no "right" to a valuable government benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely.   It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech.   For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited.   This would allow the government to produce a result which [it] could not command directly.   Such inference with constitutional rights is impermissible.

<u>Perry</u>, 408 U.S. at 597 (internal quotations and citations omitted); <u>see also</u> <u>Bd. of County Comm'rs v.</u>

<u>Umbehr</u>, 518 U.S. 668, 674 (1996) (because "constitutional violations may arise from the deterrent, or

'chilling,' effect of governmental [efforts] that fall short of a direct prohibition against the exercise of First

Amendment rights," the government "may not deny a benefit to a person on a basis that infringes his

constitutionally protected . . . freedom of speech even if he has no entitlement to that benefit.") (internal

quotation marks and citations omitted).

   Thus, the focus of the unconstitutional conditions doctrine is on whether a governmental entity

is denying a benefit to Plaintiffs that they could obtain by giving up their freedom of speech, or is

penalizing them for refusing to give up their First Amendment rights.   The Court finds that no such

conditions are imposed upon Plaintiffs under Tennessee's legislative scheme.   Cf. <u>Xcaliber v. Ieyoub</u>,

377 F. Supp. 2d at 573 (dismissing NPM plaintiffs' First Amendment claims on same grounds); <u>PTI,</u>

<u>Inc.</u>, 100 F. Supp. 2d at 1206–07 (dismissing NPM plaintiffs' First Amendment claim because "the

speech restrictions at issue in the MSA are wholly separate from the tax consequences stemming from

a tobacco distributor's choice to participate in the MSA or subject itself to the terms of [California's

version of the Escrow Act]").   The Escrow Act, as amended by the ASR Amendment, leaves Plaintiffs

no worse off financially than they would be under the MSA, because it expressly provides that Plaintiffs

are entitled to a refund on any amounts paid into escrow that they can demonstrate is in excess of the

amount they would have paid under the MSA.   See Tenn. Code Ann. §47-31-103(a)(2)(B)(ii).   Further,

Plaintiffs retain all of the First Amendment and other rights that the PMs gave up when they signed the

MSA. Because Defendant is neither denying a benefit to Plaintiffs that they could obtain by giving up their freedom of speech nor punishing Plaintiffs for refusing to give up their free speech rights, the unconstitutional conditions doctrine does not apply. The Court therefore grants Defendant's motion to dismiss plaintiffs' claim for violation of the First Amendment to the United States Constitution.

## VI. CONCLUSION

For the reasons set forth above and for good cause shown, the Court hereby grants Defendant's motion to dismiss and dismisses all claims set forth in Plaintiffs' complaint *except* insofar as Plaintiffs state a claim relating to the alleged retroactive enforcement of the ASR Amendment, which issue was not raised in Defendant's motion and has not been addressed herein. Defendant's Motion is denied as to that issue.

An appropriate Order will enter.

Thomas A. Wiseman, Jr.
Senior U.S. District Judge

40